Slip Op. 14-72

UNITED STATES COURT OF INTERNATIONAL TRADE

```
-----------------------------------------------------------------x
MID CONTINENT NAIL CORPORATION,            |
                                           |
                Plaintiff,                 |
                                           |
        v.                                 |       PUBLIC VERSION
                                           |       Before:  Gregory W. Carman, Judge
UNITED STATES,                             |
                                           |       Consol. Court No. 12-00133
                Defendant,                 |
                                           |
        and                                |
                                           |
DUBAI WIRE FZE and ITOCHU BUILDING         |
PRODUCTS CO., INC., and PRECISION          |
FASTENERS, LLC,                            |
                                           |
                Defendant-Intervenors.     |
-----------------------------------------------------------------x
```

OPINION AND ORDER

[Affirming in part and remanding in part the final results of Commerce's antidumping duty investigation of certain steel nails from the United Arab Emirates.]

Dated: June 26, 2014

*Andrew W. Kentz, David A. Yocis, Jordan C. Kahn,* and *Nathan W. Cunningham*, Picard Kentz & Rowe LLP, of Washington, DC, for plaintiff Mid Continent Nail Corporation.  With them on the brief were *Adam H. Gordon*, *Robert E. DeFrancseco, III*, and *Laura El-Sabaawi* of Wiley Rein LLP, of Washington, DC.

*Carrie A. Dunsmore*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant United States.  With her on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, *Franklin E. White, Jr.*, Assistant Director.  Of counsel on the brief was *Melissa M. Brewer*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Bruce M. Mitchell*, *Mark E. Pardo*, *Ned H. Marshak*, and *Kavita Mohan*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, for defendant-intervenors Dubai Wire FZE and Itochu Building Products Co., Inc.

*Michael P. House* and *Sabahat Chaudhary*, Perkins Coie LLP, of Washington, DC, for defendant-intervenor Precision Fasteners, LLC.

Carman, Judge: Three cases are consolidated before the court, each challenging portions of *Certain Steel Nails From the United Arab Emirates*, 77 Fed. Reg. 17,029 (Dep't of Commerce Mar. 23, 2012) (final determination) ("*Final Results*"), *as amended*, 77 Fed. Reg. 27,421 (Dep't of Commerce May 10, 2012) (am. final determination and antidumping duty order), and the unpublished Issues and Decisions Memorandum incorporated by reference, *see* Issues and Decisions Mem. for the Less Than Fair Value Investigation of Certain Steel Nails from the United Arab Emirates, A-520-804 (Mar. 19, 2012), *available at* http://enforcement.trade.gov/frn/summary/uae/2012-7067-1.pdf (last visited June 10, 2014) ("*I&D Memo*"). In the *Final Results*, the U.S. Department of Commerce ("Commerce," "Department," or "Defendant") determined that nails from the United Arab Emirates ("UAE") were being sold in the United States at less than fair value and calculated antidumping margins. Parties to the Commerce proceeding, both domestic and foreign, now challenge the *Final Results*. The Court upholds the *Final Results* in most respects but remands to Commerce to apply the improperly-withdrawn targeted dumping regulation.

## BACKGROUND

Plaintiff in this consolidated action is domestic nail producer Mid Continent Nail Corporation ("MCN" or "Plaintiff"). Defendant-Intervenors Dubai Wire FZE and Itochu

Building Products Co., Inc. (collectively "Dubai Wire") and Precision Fasteners, LLC

("Precision") are producers of subject merchandise from the UAE.[1]

## I.        Relationship Between Millennium and Precision

In determining whether Precision sold its product into the United States at less than fair

value, Commerce calculated Precision's normal value ("NV"), representing the sales price of

subject merchandise in Precision's home market, by means of constructed value ("CV"), i.e. the

price at which Precision's nails would sell in its home market (the UAE) under ordinary market

conditions. Use of CV is appropriate where, as here, the respondents do not have a viable

comparison market in their home country. *See* 19 U.S.C. § 1677b(a)(4). An important

consideration in determining CV is whether any other company exercises control over the

company whose CV is being calculated. MCN alleged that the UAE company Millennium Steel

and Wire LLC ("Millennium") controlled Precision through an affiliation relationship. *See I&D*

*Memo* at 37. MCN submitted evidence into the record purportedly supporting the allegation of

affiliation, and evidence was also gathered and placed on the administrative record by Commerce

officials who visited Precision's UAE facility to conduct verification. *See generally* Analysis

Mem. for Precision Fasteners, LLC, C.R. (Part 2) 220[2] ("*Precision Analysis Memo*"). After

---

[1] MCN filed this action under Court No. 12-00133, and Dubai Wire and Precision entered Court No. 12-00133 as Defendant-Intervenors as of right. Separately, Dubai Wire and Precision filed their own challenges to the investigation; Dubai Wire is therefore the plaintiff in Court No. 12-00153 and Precision is the plaintiff in Court No. 12-00162. The cases filed by Dubai Wire and Precision are now consolidated with the current case filed by MCN.

[2] "C.R." indicates the confidential administrative record and "P.R." indicates the public administrative record. *See* ECF No. 21. The C.R. and P.R. were each submitted in two parts

examining the evidence, Commerce determined that Precision was an independent company, and

not an affiliate under the control of Millennium. *See generally id.*; *see also I&D Memo* at 37.

## II.    <u>Targeted Dumping</u>

Pursuant to 19 U.S.C. § 1677f-1(d)(1)(A), Commerce generally "shall determine whether

the subject merchandise is being sold in the United States at less than fair value" in one of two

ways:  by comparing "the weighted average of the normal values to the weighted average of the

export prices (and constructed export prices) for comparable merchandise," or by comparing "the

normal values of individual transactions to the export prices (or constructed export prices) of

individual transactions for comparable merchandise."  It is common to refer to these two price

comparison methods as "average-to-average" and "transaction-to-transaction," respectively.

The statute contains an exception to this general rule regarding price comparisons.

Commerce "may" make its determination regarding sales at less than fair value "by comparing

the weighted average of the normal values to the export prices (or constructed export prices) of

individual transactions for comparable merchandise" if two conditions are satisfied:

> (i) there is a pattern of export prices (or constructed export prices) for
> comparable merchandise that differ significantly among purchasers, regions, or
> periods of time, and
> (ii) [Commerce] explains why such differences cannot be taken into account
> using [average-to-average or transaction-to-transaction price comparisons].

19 U.S.C. §1677f-1(d)(1)(B).

---

with overlapping numbers assigned to the documents, so the part will be indicated
parenthetically to identify where a referenced document appears.

Shortly after the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809

(1994) established the price comparison methods and their priorities as described above,

Commerce held hearings and accepted comments about how it should implement its statutory

authority over targeted dumping.[3]  As a result, Commerce promulgated a regulation stating that

"normally" Commerce would limit the application of the targeted dumping methodology to those

sales found to be targeted.  *See* 62 Fed. Reg. 27,296-01 (Dep't of Commerce May 19, 1997)

(final rule), *codified at* 19 C.F.R. § 351.414(f) (1997) (the "limiting regulation").  In 2008,

Commerce published notice in the Federal Register which stated that Commerce was

withdrawing the targeted dumping regulation and would no longer be bound by it.  *Withdrawal*

*of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*,

73 Fed. Reg. 74,930 (Dep't of Commerce Dec. 10, 2008) ("*Withdrawal Notice*").  Although

Commerce indicated that it would accept post-publication comments regarding the withdrawal,

the withdrawal was given immediate effect.  *Id.*

In its investigation of nails from the UAE, MCN alleged that the respondents had

engaged in targeted dumping, so Commerce analyzed respondents' U.S. sales data to determine

whether the allegation had merit.  In the preliminary results of the investigation, Commerce

determined that Precision and Dubai Wire had made sales that were targeted by customer,

region, and time period.  76 Fed. Reg. 68,129 (Dep't of Commerce Nov. 3, 2011) (preliminary

---

[3] The practice of structuring United States sales at less than fair value by directing them toward particular purchasers, regions, or periods of time is referred to as "targeted dumping."  For a useful discussion of the Uruguay Round negotiations and subsequent amendment of price comparison methods in United States antidumping law, see *Borden, Inc. v. United States*, 22 CIT 233, 235-38, 4 F. Supp. 2d 1221, 1224-28 (1998).

determination of sales at less than fair value) ("*Preliminary Results*"); *see also Targeted*

*Dumping Memoranda*, C.R. 105, 110.  Commerce found, however, that the ordinary average-to-

average methodology sufficed to account for the resulting price differences, so it did not apply

the average-to-transaction price comparison method.  *Targeted Dumping Memoranda*, C.R. 105,

110  In its final determination, Commerce again found that the U.S. sales of Precision and Dubai

Wire were targeted by customer, region, and time period.  *I&D Memo* at cmt. 1.  In the *Final*

*Results*, Commerce changed its approach from the preliminary results, deciding that the average-

to-average method was insufficient to account for the price differences stemming from the

targeted sales.  77 Fed. Reg. at 17,031.  *See also I&D Memo* at cmt. 4.  As a result, Commerce

applied the average-to-transaction method.  *Id.*  In doing so, Commerce applied the average-to-

transaction method to all of the U.S. sales of Precision and Dubai Wire pursuant to the

*Withdrawal Notice*, rather than limiting the average-to-transaction method to targeted sales as

required by the limiting regulation.  *Id.*

## III.    Surrogate Profit Values

One of the factors Commerce may examine while determining CV, pursuant to 19 U.S.C.

§ 1677b(e)(2)(B)(iii), is the profit margin expected for production of the subject merchandise

under ordinary market conditions.  *I&D Memo* at cmt. 6.  Commerce sought evidence showing

surrogate profit values, and the parties to the administrative proceeding placed a number of

financial statements into the record.  In the *Preliminary Results*, Commerce relied on a surrogate

financial statement from the company Arab Heavy Industries ("AHI") for profit data.  76 Fed.

Reg. at 68,134.  When Commerce issued the *Final Results*, however, Commerce instead relied

on the financial statement of the Abu Dhabi National Company for Building Materials

("BILDCO") for surrogate profit data. *I&D Memo* at 29. Commerce found that BILDCO's

financial statement most closely satisfied the surrogate value selection criteria on which the

agency relies when selecting between potential surrogate financial statements, and therefore used

it as a source for surrogate profit values. *Id.* at 29-30.

## IV.     Interest Rate Imputed to Loan from Affiliate

Dubai Wire had received a long-term loan from an affiliated company at a non-market

interest rate. *Id.* at 32. Commerce sought evidence from which it could impute a fair market

interest rate to the loan for purposes of calculating Dubai Wire's financial expenses when

determining its CV. Upon examining the relevant record evidence, Commerce determined to

impute a rate at the mid-point of Dubai Wire's 2010 short-term loans.

DISCUSSION

## I.     Jurisdiction and Standard of Review

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(c). The factual

findings and legal conclusions of Commerce in the *Final Results* will be upheld unless

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is commonly described as being "more than

a mere scintilla," and "such relevant evidence as a reasonable mind would accept as adequate to

support a conclusion." *NSK Corp. v. U.S. Int'l Trade Comm'n*, 716 F.3d 1352, 1364 (Fed. Cir.

2013) (internal citations and quotations omitted). In assessing substantial evidence, the court

determines whether the reviewed agency decision is reasonable given the record as a whole,

"even if some evidence detracts from the [agency's] conclusion." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

When Commerce interprets the antidumping statute, which is within Commerce's purview via authority delegated by Congress, the court reviews Commerce's interpretation under the two-step framework set out in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984). Within the *Chevron* framework, the court will defer to Commerce's interpretation unless there is "unambiguous statutory language to the contrary" or Commerce has reached an "unreasonable interpretation of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). Unless Commerce's interpretation of ambiguous language in the statute is "arbitrary, capricious, or manifestly contrary to the statute," the court will not set it aside. *Chevron*, 467 U.S. at 844.

## II.    Affiliation

During the investigation, MCN urged Commerce to find that Precision and Millennium were affiliated on the basis that (1) Millennium was able to exercise control over Precision in a manner meeting the definitions in 19 U.S.C. § 1677(33), and (2) that the two companies were affiliates via a close supplier relationship. *I&D Memo* at 37.

The antidumping statute states in relevant part that the term "affiliated" applies to "[a]ny person who controls any other person and such other person." 19 U.S.C. § 1677(33)(G). For purposes of the statute, "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33). Commerce regulations state that "[i]n determining whether control over

another person exists," Commerce "will consider the following factors, among others: Corporate

. . . groupings; franchise or joint venture agreements; debt financing; and close supplier

relationships." 19 C.F.R. § 351.102(b)(3). Even where these factors are present, Commerce

"will not find that control exists . . . unless the relationship has the potential to impact decisions

concerning the production, pricing, or cost of the subject merchandise or foreign like product."

*Id.* These factors will be considered in light of "the temporal aspect of a relationship in

determining whether control exists; normally, temporary circumstances will not suffice as

evidence of control." *Id.* Although the statute and regulations are silent as to the definition of a

close supplier relationship, the Statement of Administrative Action defines it as a relationship "in

which the supplier or buyer becomes reliant upon the other." Uruguay Round Agreements Act,

Statement of Administrative Action, H.R. Rep. No. 103-316, at 838 (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040, 4174-75 ("*SAA*"). Control will be found where one party has the ability to

control another, regardless of whether such control has actually been exercised. *See TIJID, Inc.*

*v. United States*, 29 CIT 307, 321-22, 366 F. Supp. 2d 1286, 1299 (2005).

During the investigation, MCN based its allegations of control on several grounds. First,

MCN claimed that Millennium and Precision shared employees. *Precision Analysis Memo*

at 2. According to MCN, the list of its managers that Precision submitted to Commerce during

the POI included an individual identified in a 2006 letter as a [[                    ]] of

Millennium. MCN also pointed to a statement made after the POI by a former Precision

employee on his LinkedIn profile, in which he referred to himself as the new [[

                                    ]]. *Id.* at 3. Precision responded that the 2006 letter

only shows that the person in question worked for Millennium "two years before Precision was formed" and that the man's statement on LinkedIn "was neither authorized nor known by Precision" and was "an inaccurate representation" by a former Precision employee. *Id.*

Second, MCN claimed that Millennium and Precision were alter egos that held themselves out to the public as a single entity. *Id.* MCN noted that the two companies shared a telephone number; had identical website design; [[                                          ]]; were regarded as a single entity in the listings of the International Staple, Nail, and Tool Association ("ISANTA") and International Code Council – Evaluation Service ("ICC-ES"); and marked a recent product shipment "Manufactured by Precision Fasteners (Millennium Steel and Wire)." *Id.* Precision attributed these mixed identifications to the [[

]], which [[            ]]. This involved [[

]]. *Id.* at 4. Precision noted that [[

]]. *Id.*

Third, MCN alleged that Precision and Millennium [[                              ]], with Precision [[                                        ]]. *Id.* According to MCN, Precision [[

]]. *Id.* According to Precision, it [[

]] pursuant to [[            ]]. *Id.* Precision notes that at verification, Commerce confirmed that Precision [[                                    ]]

and [[                                                                   ]].  *Id.*  Precision explained

that its wire-drawing machines [[

                                        ]], which Millennium agreed to do [[

                  ]].  *Id.*

        Fourth, MCN claimed that Precision and Millennium were affiliated through a close

supplier relationship because [[

                                                 ]].  *Id.* at 4-5.  MCN argued that Precision was

dependent on [[                                                                  ]], and that [[

                  ]] Precision's ability to produce nails [[

                                        ]].  *Id.* at 5.  Thus, MCN claimed, [[

                                                                   ]].  *Id.*  Precision responded that [[

                                        ]] during the POI, after which [[

                                        ]].  *Id.*  Precision noted that it moved to avoid [[

                  ]] by buying machines, but [[

                  ]] for access to high capacity electricity.  *Id.*

        Finally, MCN also urged Commerce to find affiliation based on the [[                                  ]]

between [[                                        ]] resulting from Precision's [[

                                        ]].  *Id.* at 6.  MCN claimed that Precision [[

                  ]], which is typical of an affiliate rather than [[

                  ]].  *Id.*  Precision countered that its [[

]] were typical of [[          ]] and it fully [[              ]] its own production

versus the [[                                        ]].  *Id.*

Commerce examined the evidence put forward by MCN and found no affiliation between

Precision and Millennium under 19 U.S.C. § 1677(33) or via a close supplier relationship

resulting in reliance.  *Id.* at 6-7.  Looking first at the alleged close supplier relationship,

Commerce stated that the threshold question was of reliance and the relevant standard was found

in *Stainless Steel Wire Rod from the Republic of Korea,* 71 Fed. Reg. 59,739 (Dep't of

Commerce Oct. 11, 2006) (preliminary results of antidumping duty administrative review)

("*SSWR from Korea*"), where reliance was determined based on "the exclusivity and uniqueness

of the supply relationship," and "not the level of cooperation between parties."  *Id.* at 7.

Commerce noted that Precision was able to produce all subject merchandise except [[

]], and

that Precision [[                                        ]] decreased throughout the POI.  *Id.*

at 7-8.  Given this pattern of decreasing [[

]], Commerce found the *SSWR from Korea* reliance standard

for affiliation not met.  *Id.* at 8.  Commerce noted that [[

]].  *Id.*  The

characteristics of the [[                                   ]] did not evince [[

]] because they [[



]].  *Id.*  Commerce distinguished between cooperative

[[              ]] and a reliance relationship by noting that Precision did not *have to* cooperate

[[              ]].  *Id.* at 9.  The [[              ]] did not provide for "legal or operational"

control because they did not provide for [[              ]] or advancing one party's

interests over the other since both companies could [[

]].  *Id.* at 9-10.

Regarding shared employees, Commerce found that the "evidence does not

substantiate that during the POI Precision and Millennium employed even one individual

concurrently," since the companies' [[

]].  *Id.* at 12.  Commerce found no

evidence that the individual who was a General Manager of Millennium in 2006 [[

]] came on at Precision as a Manager in 2010.  *Id.* at 13.

Commerce declined to credit the statement on a LinkedIn profile that the profile holder worked

for "Millennium/Precision" for two months after the end of the POI.  *Id.*

On Precision and Millennium holding themselves out as a single entity, Commerce

found that the confusion stemmed from the [[

]], but found none of the evidence to suggest any "discernible

ulterior motive" or "appreciable leverage to exert control."  *Id.* at 13-15.  As to [[

]], Commerce found that the evidence, especially from

verification, did not show that the companies [[              ]], but did

demonstrate some [[              ]].

*Id.* at 15-16. Commerce found this minor entanglement insufficient to demonstrate a finding of affiliation via control. *Id.* at 16. As for financial relationship, Commerce noted that financial relationship is not a control factor under 19 C.F.R. § 351.102(b)(3). *Id.* Further, Commerce found no evidence of debt financing on the record. *Id.*

### A.      Contentions of the Parties

#### 1.      MCN

Before the Court, MCN contends that Commerce acted contrary to the substantial record evidence in determining that Precision was not affiliated with Millennium. MCN's argument is that "overwhelming evidence on the record of this investigation indicates that Millennium has the ability or capacity to exert control over Precision, including the potential to impact decisions concerning the production, pricing or cost of the subject merchandise." Mem. in Supp. of Mid Continent Nail Corp.'s Rule 56.2 Mot. ("*MCN Mem.*") at 13-14, ECF No. 41.

MCN reiterates before the Court the indicators of potential affiliation that MCN raised during the investigation: [[                                    ]] (*id.* at 14-17); Precision's [[

]] from Millennium (*id.* at 18); an individual identified on LinkedIn as a [[

]] (*id.* at 18-19); an individual who in 2006 worked as a [[                          ]] at Millennium listed as Precision's General Manager during the POI (*id.* at 19); listings at ISANTA and ICC-ES implying the companies were alter egos of each other (*id.* at 19-20); [[                                    ]] (*id.* at 20-21); and the companies using [[

]] (*id.* at 21). MCN also claims Precision was reliant on [[          ]] in a

close supplier relationship in which [[

]] needed to function.  *Id.* at 22-26.

MCN claims that Commerce improperly ignored, or wrongly weighed, the record

evidence regarding [[                             ]], shared employees, alter egos, and [[

]].  *See id.* at 12-22.  Regarding Commerce's decision about a close supplier

relationship, MCN also challenges how Commerce weighed the evidence.  *Id.* at 22-33.  MCN

additionally claims that Commerce made two specific errors in characterizing the record:  (a)  in

finding that Precision could produce subject merchandise, [[

]], is belied by evidence that Precision [[

]], *id.* at 26-27; and (b) in

finding that Precision "utilizes [[              ]] only for the [[

]]," *id.* at

27.  MCN alleges that these findings are contrary to evidence that Precision [[

]] and continued to do so [[

]] purchasing its own wire drawing machines.  *Id.* at 27.

MCN claimed that the facts here were not truly distinguishable from *SSWR from Korea*,

which Commerce purported to rely on, and therefore claims that Commerce acted contrary to its

own established practice without providing a rational explanation.  *Id.* at 28-29.  Looking at the

[[             ]] between Precision and [[                  ]], MCN also points to their [[

]].  *Id.* at 29-30.  MCN argues that analogous facts have

undergirded findings of affiliation in past investigations. *Id.* at 30-31. MCN also claims that Commerce looked to the wrong time period in basing its affiliation decision on the potential future relationship between Precision and Millennium, rather than their relationship during the POI. *Id.* at 31-33.

  2. <u>Precision</u>

  Precision supports the Commerce determination of non-affiliation on the grounds articulated by Commerce in the *Final Results*. *See generally* Def.-Int. Precision's Opp'n to Pl.'s Mot. for J. on the Agency R. ("*Precision Opp.*") at 11-34, ECF No. 66. Specifically addressing MCN's argument regarding Precision's [[         ]], Precision argues that MCN's position would convert any [[     ]] into entities involved in a control relationship, which would be an unreasonable application of the statute. *Id.* at 23. Regarding the former General Manager of [[   ]] who later became Precision's General Manager, Precision points out that his [[

                        ]]. *Id.* at 26. Precision also rejects MCN's arguments that it has a close supplier relationship with Millennium for the reasons articulated by Commerce in the *Final Results*. *Id.* at 31-34.

  3. <u>Commerce</u>

  Commerce reasserts that it properly considered and evaluated the record evidence in the *Final Results*, reiterating its reasoning before the Court. *See generally* Def.'s Opp'n to Pls.' Mots. for J. Upon the Agency R. (*"Commerce Opp."*) at 8-21, ECF No. 63. Commerce points

out that even if MCN could demonstrate that Precision and Millennium shared employees as

alleged, MCN "fails to explain how that would result in control." *Id.* at 11.  Similarly,

Commerce notes the facts confirmed at verification regarding the companies' [[

                                                                                                   ]] and argues that "although the parties'

cooperation is shown, the record does not suggest that one party is [in] the position to 'control'

the other party" on this basis.  *Id.* at 13.  Addressing the [[                    ]] between Precision and

[[          ]], Commerce notes that there are no provisions permitting [[                  ]] to "impact

decisions concerning the production, pricing, or cost of the subject merchandise." *Id.* at 14.

Rather, the [[                ]] are "mutually beneficial and do not advance one party's interests

over the other party's interests." *Id.*  Commerce argues that the mutuality of the relationship is

shown by the fact that Precision was able to [[                                                      ]]

and [[                                                   ]]. *Id.*  Commerce also noted that

the [[                                                                ]], in

particular because there is an [[                                        ]]. *Id.* at 15.  Crucial to

Commerce's analysis is this [[                                      ]], which "demonstrates" to

Commerce that "the relationship is not irreplaceable," as would be the case with an affiliation

relationship involving control. *Id.*  Also crucial, Commerce contends, is the lack of the kind of

[[                      ]] that might indicate the coordination of internal decision-making and

impact production, pricing, and cost choices. *Id.* at 16.  Commerce points out that, even though

the companies shared, [[                              ]], phone and fax services, Precision doesn't

promote anyone but itself on its website. *Id.* at 17.  Commerce insists that there is no close

supplier relationship, as shown by the fact that Precision [[

]] during

the POI, may obtain that supply elsewhere, and has in fact [[

]] during the POI. *Id.* at 19-20.

**B.     Commerce's Affiliation Determination Is Affirmed**

The Court affirms Commerce as to a lack of affiliation because Commerce applied its

statute and regulations correctly, and based its decision on a reasonable assessment of the

substantial evidence on the record.  The Court is required to uphold the *Final Results* unless they

are "unsupported by substantial evidence on the record, or otherwise not in accordance with

law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Crawfish Processors*

*Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (internal citation omitted).

Where two decision makers might reach different conclusions from the same evidence,

Commerce may choose one reasonable conclusion and its decision will still be supported by

substantial evidence.  *See Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  The

Court will uphold Commerce where the weight of the record in its entirety tends to support the

determination, even where Commerce faces evidence that detracts from its conclusion.  *See*

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  The Court will not

replace Commerce's decision regarding the evidence with its own judgment where Commerce

made a reasonable call on how to settle questions raised by the record.

It is clear that Commerce engaged in the sort of searching evaluation of the record which is to remain undisturbed under the standard of review. The parties do not dispute the nature of the record evidence, but rather the conclusions to be drawn from it. Commerce acted reasonably in coming to a negative determination on the affiliation issue, since even those pieces of record evidence suggestive of overlap between the two companies did not demonstrate that Millennium was able to control Precision's decisions regarding the subject merchandise.

Commerce did not dodge or ignore evidence regarding the relationship between the companies, but rather closely examined it and reached conclusions that it was able to justify with specific analyses. To take one example, Commerce examined the details of the alleged sharing of employees and chose to base its determination on the quantum of that evidence. Certainly any reasonable mind could find that the LinkedIn profile—the sole piece of evidence that suggests an employee [[                                                              ]]— was simply too tenuous and of questionable authenticity to form the basis for a finding that the companies shared employees. Furthermore, as Commerce points out, even assuming that the LinkedIn profile should be preferred over the contrary record evidence, a hypothetical finding that Millennium and Precision [[                                        ]] would not lead to a finding that Millennium controlled Precision.

It is especially worth noting that Commerce grounded its decision on its direct observations at verification, which undercut many aspect of MCN's allegations regarding the [[                              ]] and provided robust evidence that Precision was not controlled by Millennium in this regard. The Court also finds that Commerce closely considered all of the

evidence regarding the nature of the [[                                ]] between [[          ]] and

Precision, [[                                    ]], and comprehensively interpreted the cited evidence

in a reasonable manner in the context of all of the record evidence.  It would be impossible for

the Court to say that no reasonable fact-finder could have concluded as Commerce did on the

record before it, and the Court is therefore obliged to affirm Commerce's finding that Precision

and Millennium were not affiliated.

## III.     <u>Targeted Dumping</u>

Where a petition alleges that respondents to an antidumping investigation have engaged

in targeted dumping, Commerce analyzes respondent sales to determine whether, in accordance

with the statute, there is a pattern of export (or constructed export) prices for comparable

merchandise showing significant differences based on the purchaser, region, or time period of

the sale.  *I&D Memo* at 4.  (The existence of such a pattern is a threshold requirement for

employing the average-to-transaction price comparison that constitutes the targeted dumping

remedy.  19 U.S.C. § 1677f-1(d)(1)(B).)

In order to determine whether there is a price pattern showing significant differences

along one of the targeting poles, Commerce employs a two-part test known as the *Nails* test.[4]

*See I&D Memo* at 4; *see also Commerce Opp.* at 37.  First, Commerce seeks a price pattern.  It

determines how many of the allegedly targeted sales, by volume, were made at a price more than

---

[4] The *Nails* test originated with *Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33,977 (Dep't of Commerce June 16, 2008) (final determination of sales at less than fair value), which was upheld by the Court of International Trade in *Mid Continent Nail v. United States*, 34 CIT ___, 712 F. Supp. 2d 1370 (2010).

one standard deviation below the weighted-average price of all sales. *Commerce Opp.* at 37. If the results include more than 33% of all of the allegedly targeted sales (to the allegedly targeted customer, region, or in the allegedly targeted time period), then a price pattern has been found and Commerce proceeds to the next step. *Id.* at 37-38. In the second step of the *Nails* test, Commerce determines whether the price pattern exhibits significant differences by looking for a price gap. *Id.* at 38. To do this, Commerce first determines the volume-weighted price gap of non-targeted sales; then the weighted average price of sales to the alleged target is compared to the next higher weighted average price of non-targeted sales. Commerce determines the volume of sales for which the difference between these two weighted average sales prices exceeds the volume-weighted price gap of non-targeted sales, and if the amount is over five percent of the total volume of sales to the alleged target, then Commerce finds that the price pattern exhibits significant differences. *Id.* Where both prongs of the *Nails* test are met, Commerce then applies the average-to-transaction price comparison methodology to all U.S. sales when determining the respondent's dumping margin. *Id.*

Employing this test here, Commerce determined that both Dubai Wire and Precision had patterns of export prices for comparable merchandise that varied significantly among customers, regions, and time periods. *Final Results*, 77 Fed. Reg. at 17,031; *Dubai Wire Targeted Dumping Memo*, C.R. 105, at 4-5; *Precision Targeted Dumping Memo*, C.R. 110, at 4-5.

Although Commerce had found, in the *Preliminary Results*, that the average-to-average methodology accounted for the targeting, Commerce changed this approach in the *Final Results*, deciding that the average-to-average method was insufficient to account for the price differences

stemming from the targeted sales. *Final Results*, 77 Fed. Reg. at 17,031. Commerce therefore

applied the average-to-transaction method. *Id.* Commerce did not discuss whether the

transaction-to-transaction method might account for the price differences. *Id.* In applying the

average-to-transaction method, Commerce applied it to all of the U.S. sales of Precision and

Dubai Wire pursuant to the *Withdrawal Notice*, rather than limiting it to targeted sales as

mandated by the limiting regulation. *Id.*

The relevant comments of the respondents, each of whom objected to Commerce's

targeted dumping analysis on multiple grounds, will be described below.

### A.    Contentions of the Parties

1.    Precision

Precision argues that Commerce's determination that it engaged in targeted dumping is

unlawful and not supported by the record. Precision identifies as an error that "Commerce failed

to examine and take into account whether, and to what extent, any of Precision's sales identified

by Commerce as 'targeted' were fairly traded sales (i.e., not dumped)." Brief of Pl. Precision

Fasteners, LLC in Supp. of Pl.'s Mot. for J. upon the Agency R. ("*Precision Mem.*") at 7, ECF

No. 33. In fact, Precision contends that most of its sales identified as targeted by Commerce

were "fairly traded." *Id.* Precision's contention is that the statute does not permit Commerce to

base a targeted dumping finding on a pattern of price differences in non-dumped sales. *Id.* at 7-

8.

Precision also argues that the *Nails* test is flawed and illogical, leading to results

inconsistent with the record evidence. *Id.* at 8. In this regard, Precision notes that the *Nails* test

does not take into consideration that only an "insignificant number of transactions" were identified as targeted by customer and region; that Commerce relied on arbitrary geographic divisions for its region finding, rather than using previously acknowledged official regions; and that Commerce ignored evidence of significant fluctuations in materials costs in making its finding of targeting by time period. *Id.*

Precision also claims that, even assuming the targeting analysis was legal, Commerce cannot justify application of average-to-transaction comparisons to all of Precision's U.S. sales when Commerce only found evidence of targeting for less than one percent. *Id.* Precision argues that such action was not only unreasonable but also violated the requirement in 19 C.F.R. § 351.414(f) that the average-to-transaction method be applied only to those sales identified as targeted. *Id.* at 9. For this argument, Precision contends that the *Withdrawal Notice* was "ineffective and contrary to law because it occurred outside the basic procedural framework required by Congress under the Administrative Procedure Act." *Id.* As a result, Precision insists that Commerce should be required to apply 19 C.F.R. § 351.414(f).

Precision also attacks Commerce's use of "zeroing" in calculating the targeted dumping remedy. *Id.* Zeroing is a calculation technique in which Commerce fails to treat fairly-traded sales as offsetting dumped sales, calculating them as if they were made at a zero dumping margin rather than a negative dumping margin. Precision argues that the use of zeroing in the targeted dumping calculation is inconsistent with statute and binding court precedent. *Id.*

2.      Dubai Wire

Dubai Wire attacks Commerce's targeted dumping analysis on similar grounds. Dubai Wire, like Precision, argues that Commerce acted contrary to the antidumping statute when it based its targeting finding (of a pattern of prices that differed significantly) on an analysis of sales at prices above fair value. Mem. of Law in Supp. of Dubai Wire's Rule 56.2 Mot. for J. upon the Agency R. ("*Dubai Wire Mem.*") at 9-11, ECF No. 37.

Dubai Wire contends that Commerce acts contrary to statute, court precedent, and administrative practice in its "unreasonably rigid" reliance on a "strict mathematical formula" to conduct its targeted dumping analysis in a manner that, in Commerce's own words, proceeds "without determining 'why' an exporter's pricing behavior may differ significantly." *Id.* at 11-12 (quoting *I&D Memo* at 6). In doing so, Dubai Wire argues, Commerce has ignored "the established legal principle of *de minimis*," which "operates to ensure that the underlying purpose of the statutory provision is carried out." *Id.* at 13 (*quoting Alcan Aluminum Corp. v. United States*, 165 F.3d 898, 902, 905 (Fed. Cir. 1999)). Dubai Wire echoes Precision on this point, noting that only extremely small percentages of its U.S. sales support Commerce's findings of customer and region targeting. *Id.* at 13-14.

Regarding the finding that Dubai Wire targeted its sales by customer, Dubai Wire claims that Commerce improperly rejected evidence regarding these sales which established that they varied from the ordinary course of trade and could not reasonably be compared to ordinary U.S. sales. *Id.* at 14-16. Dubai Wire also claims that Commerce acted contrary to the evidence by failing to properly consider the sharp increase in raw material prices when it analyzed Dubai

Wire's U.S. sales for targeting by time period. *Id.* at 16-20. Regarding the finding of targeting by region, Dubai Wire claims that Commerce based its determination on a small error in freight charges which was documented in the record and should have resulted in an adjustment. *Id.* at 20-21.

Like Precision, Dubai Wire also contends that Commerce acted contrary to law and the record evidence when it applied the average-to-transaction method to all Dubai Wire sales, rather than only the sales identified as targeted. *Id.* at 21-22. Dubai Wire argues that Commerce's interpretation of the antidumping statute to permit such broad application of the targeted dumping methodology is flawed because the results are "unnecessarily punitive" and "do[] not further the statute's objective." *Id.* at 22. Dubai Wire also claims that Commerce has departed from "longstanding practice" without articulating any suitable rationale. *Id.* at 23. Dubai Wire, like Precision, argues that the *Withdrawal Notice* violated the APA by revoking 19 C.F.R. § 351.414(f) without notice and comment, and that the APA's "good cause" exception was inapplicable. *Id.* at 24-26.

           3.     <u>Commerce</u>

Commerce argues that it rightly rejected Precision and Dubai Wire's requests that Commerce "establish a *de minimis* standard," by which it would "analyze the number of targeted sales as a percentage of total U.S. sales." Def.'s Opp'n to Pls.' Mots. for J. upon the Agency R. ("*U.S. Opp.*") at 38, ECF No. 63. Commerce defends its current practice on the basis of its interpretation of the language in 19 U.S.C. § 1677f-1(d)(1)(B)(i) authorizing use of the average-to-transaction method when "there is a pattern of export prices . . . for comparable merchandise

that differ significantly among purchasers, regions, or periods of time." According to

Commerce, the statute "does not establish how this pattern [of export prices] should be measured

with respect to the prevalence of underlying sales in relation to all sales." *Id.* at 39. Commerce

contends that it implements its reasonable interpretation of the statute when it measures targeted

sales by volume rather than by number. *Id.* Commerce also claims that its interpretation in this

regard was upheld in *Mid Continent Nail Corp.*, 712 F. Supp. 2d 1370. *Id.* In any case,

Commerce argues, record evidence indicates that the percentage of the U.S. sales of Precision

and Dubai Wire that were found to be targeted exceeds a *de minimis* level. *Id.* at 40.

Commerce also counters the argument that it erred in applying the average-to-transaction

comparison method to all U.S. sales upon a finding of targeting. *Id.* at 40-41. Commerce first

points out that the statute itself is silent as to how broadly Commerce should apply the method

once a targeting finding is made, and argues from this that "nothing in the statute restricts"

Commerce in this regard. *Id.* at 40. Commerce argues that applying the targeted dumping

methodology to all sales is "the most effective way to unmask targeted dumping, and to

implement the statute's goal," since an exporter can use "profitable sales" to gain an offset and

hide sales dumped in a targeted fashion. *Id.* at 40-41.

### B.      Commerce Must Apply the Targeted Dumping Regulation

The Court finds that Commerce violated its obligation to provide notice and opportunity

for comment prior to the rescission of the targeted dumping regulation. As a consequence, the

Court finds that the *Withdrawal Notice* is invalid. The Court will therefore remand the case back

to Commerce for redetermination. On remand, Commerce must apply the targeted dumping

regulation, 19 C.F.R. § 351.414(f) (1997), mandating that Commerce limit the scope of the average-to-transaction method to those sales Commerce identifies as targeted sales.

Pursuant to the Administrative Procedure Act ("APA"), "[g]eneral notice of proposed rule making shall be published in the Federal Register" and shall include "either the terms or substance of the proposed rule." 5 U.S.C. § 553(b). After publishing the notice, the agency must "give interested persons an opportunity to participate in the rule making" by submitting comments. *Id.* § 553(c). Notice of a new rule must be published "not less than 30 days before its effective date" unless "otherwise provided by the agency for good cause found and published with the rule." *Id.* § 553(d). This good cause exception to the notice requirement applies if Commerce finds that notice is "impracticable, unnecessary, or contrary to the public interest" and incorporates that finding and an explanation into the new rule. 5 U.S.C. § 553(b)(3)(B).

The *Withdrawal Notice* is of the kind of "rule making" covered by the notice requirement because "new rules that work substantive changes in prior regulations are subject to the APA's procedures." *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003). New agency requirements "that will affect subsequent agency acts and have a future effect on a party before the agency" trigger the need for notice. *Id.* at 373. This notice requirement "does not simply erect arbitrary hoops through which federal agencies must jump without reason," but "improves the quality of agency rulemaking by exposing regulations to diverse public comment," "ensures fairness to affected parties," and "provides a well-developed record that enhances the quality of judicial review." *Id.* (internal citation and quotations omitted).

Commerce insists that it satisfied its APA notice and comment obligations when it published two notices in the Federal Register seeking comment on its implementation of the targeted dumping provisions of the statute.  *U.S. Opp.* at 50, citing *Proposed Methodology for Identifying and Analyzing Targeted Dumping in Antidumping Investigations*, 72 Fed. Reg. 60,651 (Dep't of Commerce Oct. 25, 2007) (request for comment) and *Proposed Methodology for Identifying and Analyzing Targeted Dumping in Antidumping Investigations*, 73 Fed. Reg. 26,371 (Dep't of Commerce May 9, 2008) (request for comment).  Commerce argues that it need not publish the precise content of the rule it ultimately adopts in order for the notice to be effective, but may instead take action that allows the public "the opportunity to comment meaningfully consistent with the statute." *Id.* at 53.

Commerce also insists that the APA's good cause exception to the notice and comment requirement was met here.  *Id.* at 54.  Commerce states that it may have imposed on itself, with the limiting regulation, too much restriction as to how to conduct a targeted dumping investigation, with the effect of "inadvertently denying relief to domestic industries suffering material injury from unfairly traded imports." *Id.* at 55 (internal quotations and citations omitted).  Commerce identified the need to provide speedy relief under the statute to U.S. producers as justifying a public interest exception to the APA notice and comment requirements here.  *Id.* at 55-56.  Finally Commerce argues that even if the *Withdrawal Notice* was improperly issued, the impropriety did not harm Precision and Dubai Wire because the *Withdrawal Notice* placed no new requirements on them.  *Id.* at 57-58.

The Court finds that the two requests for comment did not satisfy the APA notice and comment requirement. An APA notice must "be sufficiently descriptive to provide interested parties with a fair opportunity to comment and to participate in the rule making." *Gold East Paper (Jiansu) Co., Ltd. v. United States*, 37 CIT ___, 918 F. Supp. 2d 1317, 1325 (2013) ("*Gold East Paper*") (internal quotations and citations omitted). As *Gold East Paper* noted, the comment requests and the *Withdrawal Notice* make no references to each other. *Id.* at 1326. It is not obvious to an interested observer that connected rule making is intended, since the comment requests "discuss the methodologies that Commerce will use to determine whether targeted dumping has occurred," but the limiting regulation "restricts Commerce's ability to impose the targeting remedy across all sales." *Id.*

The Court furthermore finds it improper here to apply the APA's good cause exception to providing notice and comment prior to rule making. "The good cause exception is to be narrowly construed and only reluctantly countenanced." *Id.* (quoting *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980) (internal quotations omitted). The limiting regulation was adopted only after prolonged agency consideration that included a hearing and the submission of extensive pre and post hearing comments. *See* 62 Fed. Reg. at 27,296. Commerce's argument for a good cause exception here boils down to the notion that the limiting regulation presented an urgent danger of harm to domestic industries so compelling as to permit deviation from normal notice and comment requirements. But there was no pressing urgency of a type that does not always exist in the trade context; as pointed out in *Gold East Paper*, this justification "could apply to *almost any* rule promulgated by the agency." 918 F. Supp. 2d at 1327 (emphasis in

original).  To permit the good cause exception here would be to allow the exception to swallow

the rule and effectively nullify the APA's limitation on summary agency action.

Commerce states that APA notice and comment violations are generally subject to the

harmless error rule, i.e., a violation by the agency will only result in invalidating the agency's

action where a party has suffered prejudice from the violation.  *See* 5 U.S.C. § 706 (stating that

"due account shall be taken of the rule of prejudicial error" by courts reviewing agency action).

Commerce contends that the respondents suffered no harm because "the regulation withdrawal

did not impose any new obligations on them."  *U.S. Opp.* at 57.  Assuming without deciding that

the harmless error rule applies in this context, the Court finds that the harmless error rule is not

so protective of agency missteps.  Because the harmless error rule is more susceptible to being

abused in the administrative rule making context than in the civil or criminal adjudication

process, courts must accordingly "exercise great caution in applying" it in rule making cases.

*Paulsen v. Daniels*, 413 F.3d 999, 1006 (9th Cir. 2005) (internal citations omitted).  This

potential for abuse exists because an administrative agency has such great discretion when rule

making that it need not "adopt a rule that conforms in any way to the comments presented to it,"

and may even go so far as to "adopt a rule that all commentators think is stupid or unnecessary,"

so long as the agency simply explains its reasons.  *Id.* (internal citations omitted).  Consequently,

a court should "focus on the process as well as the result," an exhortation that has led one court

to find a notice and comment violation harmless "only where the agency's mistake clearly had

no bearing on the procedure used or the substance of the decision reached."  *Id.* (internal

quotations and citations omitted).  Here, the process used in determining whether Precision and

Dubai Wire engaged in remediable sales at less than fair value, and the margin to be assessed to remedy alleged dumping, were both central issues of the *Final Results* that were substantially affected by Commerce's failure to apply the limiting regulation. The Court therefore rejects Commerce's argument that the notice and comment defect in the *Withdrawal Notice* was a harmless error.

When, in the course of rule making, an agency violates the notice and comment requirements of the APA and the violation is not harmless, the new rule is invalid, resulting in reinstatement of the prior rule. *Id.* at 1008. Similarly, a regulation withdrawn in violation of the APA notice requirement will be enforced. *Citibank, Fed. Savings Bank v. FDIC*, 836 F. Supp. 3, 7 (D.D.C. 1993). The Court therefore rules that Commerce's *Withdrawal Notice* was invalid and, as a consequence, the Court will remand the case to Commerce. On remand, Commerce must redetermine the respondents' dumping margins by applying the limiting regulation of 19 C.F.R. § 351.414.

### C.      Ruling on Other Targeted Dumping Issues Will Be Held in Abeyance

The Court has carefully considered the numerous other issues raised by the parties regarding the manner in which Commerce analyzed and decided the targeted dumping allegations in this investigation. Given that the Court is remanding the case to Commerce to apply the limiting regulation, Commerce will again face in its redetermination the statutory question, under 19 U.S.C. § 1677f-1(d)(1), of whether any pattern of prices that differ significantly can be accounted for using either the average-to-average or the transaction-to-

transaction[5] methodology.  Commerce may decide that it cannot or should not apply the average-to-transaction methodology at all on redetermination.  It would thus be premature for the Court to rule on the other aspects of the targeted dumping methodology challenged here, since the basis for those rulings may evaporate after the remand.

When Commerce files its remand redetermination, the parties will have a chance to file comments on the results.  At that time, the parties may challenge any aspects of Commerce's targeted dumping methodology, and the Court will rule on such issues, as appropriate, after the redetermination and comments of the parties have been submitted for consideration.

## IV.     **Surrogate Profit Statements**

Normal value ("NV") is determined by Commerce based on the price at which the foreign like product is sold in the comparison market, as long as there are sufficient sales of an ordinary type to serve as a proper comparison.  19 U.S.C. § 1677b(a)(1).  In an investigation such as the one underlying this case, however, where there is no viable comparison market for subject merchandise in the UAE, Commerce instead bases NV on CV.  19 U.S.C § 1677b(a)(4).  Commerce is required to determine CV based on, *inter alia*, the actual expense and profit figures incurred by a company; if those amounts are unavailable, the statute permits Commerce, as relevant here, to determine CV based on "any other . . . reasonable method."  19 U.S.C. §

---

[5] The Court notes that Commerce does not appear to have addressed whether or not the transaction-to-transaction method would have been able to account for the targeted dumping found here.  The statute and the framework of judicial review in such cases require that Commerce state its rationale, which Commerce should do in the redetermination.

1677b(e)(2)(B)(iii). Here, Commerce chose to rely on a surrogate financial statement for the profit portion of CV. *U.S. Opp.* at 23.

When faced with the need to obtain a surrogate financial statement to establish CV, Commerce applies a set of surrogate financial criteria to choose between statements available in the record. Commerce weighs "several factors, including: (1) similarity of the potential surrogate company's business operations and products to the respondent; (2) the extent to which the financial data of the surrogate company reflects sales in the United States as well as the home market; (3) the contemporaneity of the surrogate data to the POR; and, (4) the similarity of the customer base." *I&D Memo* at 27 (citing prior administrative decisions). In applying this test, Commerce consistently takes the position that "[t]he greater the similarity in business operations and products, the more likely that there is a greater correlation in the profit experience of the companies." *Id.*

Here, there were six financial statements on the record from which Commerce could seek an appropriate surrogate: BILDCO; AHI; Global Fasteners Limited ("GFL") (a Dubai Wire affiliate); Al Jazeera Steel Products Co. SAOG ("Al Jazeera"); National Metal Manfacturing and Casting's Companies ("NMN"); and Conares Metal Supply Limited ("Conares"). *See U.S. Opp.* at 23. In the *Preliminary Results*, Commerce chose to use AHI's statement as a surrogate for profit in the CV calculation, finding that AHI "produces products in the same general category of merchandise as nails." 76 Fed. Reg. at 68,134. For the *Final Results*, Commerce chose instead to use BILDCO's financial statements as a surrogate. *I&D Memo* at 29. Commerce made this change because "BILDCO's business operations and products appear to be more similar" to the

respondents', since it "is a trader and manufacturer of building materials," "is a steel processor," "operates within the same UAE construction industry," and even has the same "customer base, the construction industry" as respondents. *Id.* Commerce noted that "the principal activities of AHI are ship repair, shipbuilding and fabrication of relatively sophisticated products such as platforms, barges, and pontoons," and its "customer base includes the marine, offshore, and engineering industries." *Id.* Commerce therefore found that BILDCO's profit statement was "a more reasonable option" than AHI, which operated and served a market "substantially divergent from" respondents. *Id.*

Dubai Wire argued that Commerce should not use AHI's information due to the divergent industry in which AHI functioned, but sought to have Commerce use the profit statement of its affiliate GFL instead. *Id.* at 21-22. Precision argued that use of the AHI statement was "unlawful and unreasonable" since, as a shipbuilding company, AHI produced materials completely unlike steel nails. *Id.* at 22-23. Precision instead sought to have Commerce calculate CV profit by "using Precision's profit on the sales of drawn wire in the home market," arguing that drawn wire and nails are generally similar. *Id.* at 23. Precision alternatively argued for use of "one or a combination of several other producers of merchandise in the same general category as the subject steel nails," including GFL, BILDCO, Conares, Al Jazeera, NMN. *Id.*

MCN argues that AHI remained the best source of surrogate profit values. *Id.* at 24. MCN stated that Commerce must reject GFL data as unreasonable and inaccurate; must reject Precision's drawn wire sales due to insufficient quantities; and must reject the other potential contenders as less reliable than AHI. *Id.* at 24-25.

Commerce noted that, after issuing the *Preliminary Results*, the parties placed additional financial statements on the record for Commerce to consider under the test given above. *Id.* at 25. Commerce rejected Al Jazeera and NMN because they were not UAE companies and Commerce sought home market profit experience to the extent possible. *Id.* at 27. Regarding GFL, Commerce determined that GFL's 2010 profit calculation for sales of screws and nails was not reliable since GFL purchased its nails from affiliate Dubai Wire rather than producing them. *Id.* GFL also had not provided sufficient evidence about the cost difference between models of screws, and did not differentiate sufficiently between the costs of screw sales in its domestic versus export markets. *Id.* As a result, Commerce found that GFL's profit statements were unreliable and chose not to use them in calculating CV. *Id.* at 28. In response to the backup argument by Dubai Wire that Commerce should then simply use GFL's company-wide 2009 or 2010 financial statements, Commerce noted that those statements primarily reflected export sales rather than home market sales and were equally unreliable as to CV for that reason. *Id.*

Regarding Conares, Commerce's practice is to use third-party, non-proprietary, publicly available financial statements for CV profit calculations, but Conares' statements were proprietary. *Id.* at 29. Ranged statements from Conares that were non-proprietary were rejected as "imprecise" and not matching "the segmented operations that are reported in the proprietary version." *Id.*

Commerce also considered whether BILDCO or AHI provided a better surrogate. Neither BILDCO nor AHI produced subject merchandise, so Commerce examined which company operated most like Dubai Wire and Precision. *Id.* Commerce found that BILDCO was

"a trader and manufacturer of building materials" and "a steel processor . . . [with] a steel processing facility to cut and bend steel" that "operates within the same UAE construction industry as Dubai Wire and Precision." *Id.* BILDCO also had "the same" customer base as Dubai Wire and Precision. *Id.* In contrast, Commerce noted that AHI's principal activities were "ship repair, shipbuilding and fabrication of relatively sophisticated products such as platforms, barges, and pontoons," and AHI had as customers "the marine, offshore, and engineering industries." *Id.* Considering all of these factors, Commerce determined that BILDCO's "business operations and products appear to be more similar to those of Dubai Wire and Precision" than the other options. *Id.*

### A.      Contentions of the Parties

####       1.      MCN

MCN argues that Commerce's decision to rely on BILDCO's financial statement as a profit surrogate was unsupported by evidence and contrary to law. *MCN Mem.* at 34-39. The main thrust of MCN's argument is that BILDCO is more a trading company than a producer; while BILDCO appears to cut and bend rebar, MCN contends that BILDCO does not fabricate the rebar or any other steel product. *Id.* at 35-36. MCN contrasts this with AHI and notes that Commerce found in the *Preliminary Results* that AHI made products in the same category as respondents. *Id.* at 36. MCN cites record evidence that AHI is, predominantly, a steel fabricator. *Id.* at 37. MCN's view is that it was "manifestly unreasonable" for Commerce to switch its reliance from the AHI statement to the BILDCO statement. *Id.* at 37-38. MCN also claims that Commerce did not even address the low level of BILDCO's inventory "composed of raw

materials," or operating and staff cost ratios, submitted by MCN in the *Final Results*, rendering them arbitrary and contrary to law.  *Id.* at 38-39.

2.       Dubai Wire

Dubai Wire argues that Commerce should have used the GFL financial statements. *Dubai Wire Mem.* at 29-45.  Dubai Wire argues that it and GFL "are sister companies" far more similar than Dubai Wire and BILDCO.  *Id.* at 32-33.  GFL's home market and export sales were all before Commerce, while BILDCO's U.S. sales were not and its home market profit could not be calculated.  *Id.* at 33.  Alternatively, Dubai Wire contends that Commerce should have used GFL's audited financial statements of profit for 2009 or 2010.  *Id.* at 34-35.  Dubai Wire also attacks Commerce's determination that the GFL "profit calculation results in an unreliable profit figure," which was the rationale Commerce used for not relying on it.  *Id.* at 35-43.  Dubai Wire contends that Commerce improperly rejects Dubai Wire's request that CV profit be based on GFL's worldwide profit from its 2010 or 2009 financial statement.  *Id.* at 43-45.

Finally, Dubai Wire claims that Commerce abused its discretion when it rejected the financial statement of Conares.  *Id.* at 45-46.  Dubai Wire placed Conares' financial statement on the record on November 3, 2011 as confidential information, and placed a public profit and loss statement summary on the record on December 22, 2011.  *Id.* at 45.  On February 21, 2012, Dubai Wire submitted Conares' financial statement as a public document, but Commerce rejected it as "new factual information" submitted after the deadline for new factual evidence had passed.  *Id.* at 45-46.  Dubai Wire claims that the application of the deadline was contrary to law since the document itself was not new, only its designation as confidential or public.  *Id.* at 46.

**B.      Commerce's Choice of BILDCO for Surrogate Profit Statements Is Affirmed**

In reviewing Commerce's decision, the Court is mindful that the standard of review calls

for the agency's decision to be upheld unless "unsupported by substantial evidence on the record,

or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The Court finds that

Commerce based its decision to rely on the BILDCO financial statements on "such relevant

evidence as a reasonable mind would accept as adequate" to support its conclusion. *See NSK*

*Corp.*, 716 F.3d at 1364 (internal citation and quotation omitted). Commerce, faced with the

need to identify a reliable surrogate financial statement from among those submitted into the

record, articulated a sensible rationale for its choice that drew on and considered the evidence in

the record. Because that decision was based on a reasonable evaluation of the evidence, the

Court affirms this aspect of the Final Results.

Dubai Wire argues in the alternative that Commerce should have used the financial

statement of Conares. Dubai Wire had placed Conares' financial statement on the record as

business proprietary information, and for that reason, Commerce declined to use it. *I&D Memo*

at 29 ("it is our practice to use non-proprietary, publicly available financial statements when

presented with third-party financial statements"). After the deadline for the submission of new

factual evidence had expired, Dubai Wire attempted to place Conares' financial statement on the

record as a public document, but Commerce rejected it as untimely. Dubai Wire argues that

Commerce's rejection was contrary to law because the data was not "new" but was simply the

same data previously available to the parties under an Administrative Protection Order, now

made available to the public. *Dubai Wire Mem.* at 46. Dubai Wire cites no authority for its

argument.  Commerce argues that the pubic version of the Conares statement was "'new' factual information in the sense that it had been designated as proprietary and analyzed as a proprietary document by Commerce and by the parties."  *U.S. Opp.* at 33.

The Court is unaware of any authority indicating whether a public document, submitted to replace a confidential document after the evidentiary submission period has expired, is new evidence for purposes of the deadline.  However, the Court notes that the applicable deadline is contained in a Commerce regulation.  *See* 19 C.F.R. § 351.301.  This specific situation is not addressed with particularity in the regulation.  In the absence of contravening authority, the Court must defer to Commerce on the interpretation of its own regulation, so long as that interpretation is reasonable.  Here, Commerce has expressed to the Court the interpretation that its regulation does not permit the submission of a public version of a confidential document into the record outside the ordinary deadline for the submission of new factual evidence.  *U.S. Opp.* at 33.  The Court finds that Commerce has asserted a reasonable interpretation of its deadline regulation and, pursuant to *Chevron*, the Court defers to that interpretation.  Therefore, the Court affirms Commerce's decision to reject the public submission of the Conares financial statement.

## V.      **Imputed Interest Rate**

Pursuant to 19 U.S.C. § 1677b(e)(2), Commerce is to account for payments for "general and administrative expenses" when calculating a party's CV.  In doing so for Dubai Wire, Commerce examined interest payments that Dubai Wire made on a loan from an affiliate and disregarded them pursuant to 19 U.S.C. § 1677b(f)(2) (permitting Commerce to disregard transaction between affiliated parties where the transaction amount "does not fairly reflect" the

usual amount "in the market under consideration"). Where Commerce applies the transactions-disregarded rule, the statute instructs Commerce to replace the disregarded data by using "the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." *Id.* The statute directs Commerce to replace the actual interest payments made by Dubai Wire with surrogate data based on whatever information was in the record as to what Dubai Wire would have paid in interest if it obtained the loan from a non-affiliate, and to use the surrogate interest rate in the CV calculation as an element of Dubai Wire's general and administrative expenses.

Commerce considered several sources of information as potential bases of an imputed rate for Dubai Wire's long-term loan. MCN urged Commerce to impute a 2010 interest rate on the affiliated loan based on a weighted average of the rates of several unaffiliated bank loans held by Dubai Wire in 2010. *I&D Memo* at 31. MCN also argued that Commerce should increase the amount for accrued interest from 2008 and 2009 on the principal of the loan, based on MCN's view that the interest charged in those years was below market rate. *Id.* Dubai Wire contended that Commerce should base the imputed rate on a calculation from its financial statements, dividing interest expense by average 2010 loan balance. *Id.* If, however, Commerce chose to use a rate based on market-rate loans from 2010, Dubai Wire asked Commerce to include an unaffiliated supplier's loan. *Id.* Dubai Wire also argued that Commerce's rate from the preliminary results was excessive because it was based on short-term unaffiliated loans rather than long-term unaffiliated loans. *Id.* Finally, Dubai Wire contended that the 2008 and 2009 accrued interest was at market rate and should not be adjusted upward. *Id* at 31-32.

Commerce agreed with Dubai Wire that its 2008 and 2009 accrued interest was at market rate, due to a 2004 restructuring effective through the end of 2009, and accordingly did not upwardly adjust it. *Id.* at 32. In setting an imputed market rate for the POI, Commerce constructed a rate representing the midpoint of Dubai Wire's several unaffiliated short-term 2010 loans. *Id.* at 33. Commerce chose to rely on these short-term loans because it found them to be the best information in the record given that they were actual rates and given that Dubai Wire did not enter into any unaffiliated long-term loans in the POI. *Id.* Commerce also preferred these loans over a calculation from Dubai Wire's financial statements based on the same finding. *Id.* Commerce did not include Dubai Wire's unaffiliated supplier loan in its calculation because it found that such loans "have considerations other than simply commercial lending" that can result in "favorable rates." *Id.*

### A.      Positions of Parties Regarding Interest Rate Imputed to Dubai Wire

#### 1.      Dubai Wire

Dubai Wire objects to the surrogate interest rate that Commerce chose to impute to its affiliate loan. Dubai Wire claims that the record contained evidence of long-term loans it and its affiliate obtained at lower rates in 2004 and 2009, respectively, which Commerce should have relied upon in accordance with its ordinary practice. *Dubai Wire Mem.* at 27-28. Dubai Wire also contends that Commerce ignored the record evidence when treating the affiliate loan as having been essentially a new loan for 2010 by virtue of its renegotiation, and in having stated that Dubai Wire's interest rates on short and long term loans in prior years were "comparable."

*Id.* at 28. Dubai Wire claims that, in basing its imputed interest rate on these unsupported

findings, Commerce acted contrary to law and without record support. *Id.* at 28-29.

      2.    <u>MCN</u>

    MCN supports Commerce's decision on the imputed interest rate. MCN argues that

Commerce acted in accordance with its established practice in refusing to use the loan rates of

Dubai Wire's affiliate when there were multiple rates for loans to Dubai Wire itself on the

record. Mid Continent Nail Corp.'s Resp. to Def.-Int.'s Rule 56.2 Mots. and Brs. in Supp.

("*MCN Resp. Mem.*") at 42, ECF No. 67. MCN also points out that Commerce has previously

relied on short-term unaffiliated loans as it did here. *Id.* at 42-43 (citing administrative

determinations). As to the 2004 loan rate Dubai Wire argues Commerce should have relied

upon, MCN contends that Commerce acted reasonably in relying instead on data more

contemporaneous with the POI. *Id.* at 43. As to Dubai Wire's contention that Commerce erred

in interpreting the 2010 loan renegotiation as a "new" loan, MCN points to a questionnaire

response in which Dubai Wire itself indicated that it had "settled its outstanding dues" to the

lender via the renegotiation. *Id.* at 43-44. MCN's view is that Commerce based its

determination that the old loan had been satisfied by a new loan via the renegotiation on this

evidence in the record and therefore acted with record support. *Id.* Finally, MCN notes that

Dubai Wire's financial statements support Commerce in finding that the imputed rate Commerce

chose was "comparable" to Dubai Wire's "actual, effective market-based interest rate during

2010," which was "even higher" than the imputed rate "when properly time-adjusted." *Id.* at 44-

45.

3.      Commerce

Commerce justifies its decision not to rely on the rate of Dubai Wire's 2004 (or its affiliate's 2009) long-term loan by contending that it "was not required to rely on a previously negotiated 2004 or 2009 long-term loan rate to impute interest on a 2010 long-term loan simply because they were both long-term loans." *Commerce Opp.* at 34. Citing prior decisions where it declined to rely on loan rates outside the POI, Commerce claims that it was reasonable to rely on 2010 short-term loan rates instead given that the relevant long-term loans had been renegotiated in 2010, effectively nullifying the relevance of the pre-2010 rates. *Id.* at 34-35. Commerce also points out that the 2004 loan was, for all practical purposes, a "new" loan for 2010 because its 2004 terms were "replaced by newly renegotiated 2010 terms" effective after the end of 2009. *Id.* at 35. Finally, Commerce contends that Dubai Wire's argument that it paid non-comparable interest rates on both short-term and long-term loans in prior years is not supported by the record. *Id.* at 36. Commerce points out that Dubai Wire's argument relies on rates on loans obtained by its affiliate, not itself, and states that it acted reasonably and in accordance with the record in using rates on loans obtained by Dubai Wire itself instead of those obtained by its affiliate. *Id.*

**B.      Commerce Is Affirmed as to the Imputed Loan Rate**

Dubai Wire's complaint about the interest rate Commerce chose to impute is a quibble about Commerce's exercise of authority under the statute to decide the appropriate interest rate from "the information available" in the administrative record. 19 U.S.C. § 1677b(f)(2). The Court finds that Commerce gave due consideration to the evidence in the record in settling on the

interest rate it imputed to Dubai Wire's long-term affiliated loan. Commerce's decision was reasonable because Commerce balanced the need to find a comparable loan with the nature of the available evidence to arrive at a measured solution. Contrary to Dubai Wire's arguments, Commerce reasonably interpreted the record evidence as to the true import of Dubai Wire's 2004 loan and its renegotiation. Commerce also reasonably weighed the competing interests in basing the imputed loan rate on long-term loans versus basing it on evidence about actual 2010 loans taken by Dubai Wire itself. In choosing to base the imputed rate on the mid-point of Dubai Wire's actual 2010 loans, even though those loans were short-term rather than long-term, Commerce made a rational decision of exactly the sort authorized by the statute. Commerce's decision also did not deviate in any unexpected or unreasonable manner from its prior pratice. The Court consequently affirms Commerce's decision regarding the interest rate to be imputed to Dubai Wire's long-term loan from an affiliate.

CONCLUSION

For the reasons given above, it is hereby

ORDERED that the decision of Commerce that Millennium and Precision were not affiliated companies be, and hereby is, affirmed; and it is further

ORDERED that Commerce's decision to use the BILDCO financial statements as a source for surrogate profit values in calculating CV be, and hereby is, affirmed; and it is further

ORDERED that Commerce's decision as to the most appropriate interest rate to impute to the loan Dubai Wire received from an affiliate be, and hereby is, affirmed; and it is further

ORDERED that this case be remanded to Commerce for a redetermination, during the course of which Commerce must apply the targeted dumping regulation improperly withdrawn by Commerce, given that the court has ruled that the *Withdrawal Notice* was invalid as it violated the notice and comment requirements of the Administrative Procedure Act; and it is further

ORDERED that counsel for the parties shall confer and no later than July 14, 2014 shall submit via ECF a joint proposed scheduling order to govern the completion of the remand redetermination, the filing of comments by the parties, and the filing of a response to the comments by the Department.

/s/Gregory W. Carman
Gregory W. Carman, Judge

Dated:     June 26, 2014
           New York, NY